IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

RICKY R. WARREN, JR.,
      Petitioner,

vs.                           Case No.:  4:16cv141/MW/EMT

SECRETARY FLORIDA DEPARTMENT
OR CORRECTIONS,
      Respondent.
_____/

## SECOND REPORT AND RECOMMENDATION

The District Judge recommitted this matter to the undersigned on June 29, 2017, with directions to require the parties to file additional materials regarding Petitioner's allegation that he would have declined a post-conviction plea offer and persisted in seeking a new trial via his state collateral motion had collateral-review counsel amended the collateral motion to include a claim of ineffective assistance of trial counsel ("IATC"), based upon trial counsel's failure to strike a certain juror for cause (*see* ECF No. 28).  The parties have now submitted their materials (*see* ECF Nos. 36, 42).

After careful consideration of the parties' submissions, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the

undersigned that the pleadings and attachments before the court show that Petitioner

is not entitled to federal habeas relief.

I.      RELEVANT BACKGROUND

On August 25, 2011, a jury found Petitioner guilty of first degree felony murder

(Count I), attempted first degree murder (Count II), and armed robbery with a firearm

(Count III) (ECF No. 18, Ex. A at 65–69, Exs. D, E, F, G).[1]  Petitioner was

represented at trial by Attorney Gregory Cummings (*see, e.g.*, Ex. A at 2).  The state

court sentenced Petitioner to life imprisonment on Count I, and concurrent terms of

(30) years in prison on Counts II and III, to run concurrently with the sentence on

Count I and with pre-sentence jail credit of 556 days (Ex. A at 70–78, Ex. G at 590).

On June 24, 2013, Petitioner filed a motion for post-conviction relief, pursuant

to Rule 3.850 of the Florida Rules of Criminal Procedure, asserting nine claims (Ex.

T).  Petitioner filed an amended motion on May 12, 2014, reducing his claims to six

(Ex. Y).  On December 6, 2014, Petitioner supplemented his amended motion to add

one more claim (Ex. AA).  The court appointed Attorney Daniel Hogan to represent

Petitioner (*see* Ex. BB).  Prior to resolution of the collateral motion, Petitioner entered

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 18).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

an agreement with the State to plead guilty to a lesser offense of second degree murder as to Count I and receive a reduced sentence of 40 years in prison, in exchange for Petitioner's dropping his post-conviction motion (*see id.* at 2). The post-conviction court conducted a colloquy and accepted Petitioner's plea (*id.* at 18–20). An amended judgment was rendered on February 18, 2015 (Ex. DD).

Petitioner filed a federal habeas petition asserting a single ground for relief (ECF No. 1). Petitioner alleges his trial counsel was ineffective for failing to strike Juror Copeland for cause, based upon Copeland's statement that he could not disagree with his friend, Juror David Iglesias (*see* ECF No. 1 at 8; ECF No. 20 at 2 & n.1).[2] Petitioner admitted he did not exhaust this IATC claim in his state collateral proceeding (*see* ECF No. 1 at 7; ECF No. 2 at 5). Petitioner alleges he asked Attorney Hogan to amend the post-conviction motion to add the IATC claim, but Attorney Hogan refused (ECF No. 2 at 6). Petitioner contends he is entitled to a federal merits review of his IATC claim pursuant to <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012).

On May 1, 2017, the undersigned issued a Report and Recommendation recommending that Petitioner's § 2254 petition be denied, because Petitioner failed

---

[2] Page references to the parties' pleadings refer to the page numbers automatically assigned by the court's electronic filing system.

Case No.: 4:16cv141/MW/EMT

to satisfy the "cause and prejudice" standard of <u>Martinez</u> (*see* ECF No. 25). The undersigned concluded:

> Here, Petitioner failed to show that his procedural default of the IATC claim was caused by ineffective assistance of his post-conviction counsel, Attorney Hogan. Even if Hogan was deficient for "refusing" to amend Petitioner's Rule 3.850 motion to include the IATC claim regarding Juror Copeland, Petitioner has failed to demonstrate a reasonable probability that the result of the post-conviction proceeding would have been different if Hogan had not refused to amend the Rule 3.850 motion. Petitioner does not allege that he would have rejected the State's 40-year plea offer if Hogan had included the IATC claim in the Rule 3.850 motion. Therefore, he failed satisfy the prejudice prong of the <u>Strickland</u> standard with respect to his assertion of ineffectiveness on the part of post-conviction counsel.

(ECF No. 25 at 15).

After receiving the Report and Recommendation, Petitioner acknowledged in his Objections that he had not alleged in his § 2254 petition that he would not have agreed to plead guilty to the 40-year sentence but for Attorney Hogan's refusal to include the IATC claim (i.e., that trial counsel failed to strike Juror Copeland) (*see* ECF No. 26). Petitioner argued, both in his Objections and in a contemporaneously filed motion to amend his § 2254 petition, that he wished to offer precise allegations and contemporaneous evidence to show that he would have persisted in seeking to obtain a new trial via his collateral motion but for Attorney Hogan's refusal to include the IATC claim in the motion (*see* ECF Nos. 26, 27).

The District Judge, in an abundance of caution and to give Petitioner every chance to argue his case, and to create the most complete record for appeal, rejected the Report and Recommendation, and although the District Judge denied Petitioner's motion to amend his § 2254 petition, the District Judge recommitted the matter to the undersigned with directions to:

> require petitioner to file a pleading and evidentiary material, and the respondent to file a response, regarding the allegation that petitioner would have declined the plea offer and persisted in seeking a new trial via his Rule 3.850 motion had collateral-review counsel included his trial-counsel ineffective assistance claim in the Rule 3.850 motion.

(ECF No. 28 at 5–6).

Petitioner has now submitted his materials, and Respondent has filed a response (*see* ECF Nos. 36, 42).

II.    ANALYSIS

In <u>Martinez</u>, the Supreme Court held that if "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim . . ." when (1) "the state courts did not appoint counsel in the initial-review collateral proceeding" or (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective" pursuant to <u>Strickland [v. Washington</u>, 466 U.S.

668 (1984)]."  566 U.S. at 14.  In such instances, the habeas petitioner "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  *Id.*

A.    Has Petitioner shown that Attorney Hogan was ineffective for refusing to amend the Rule 3.850 motion and advising Petitioner to accept the State's post-conviction plea offer.

The two-part test articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) applies to claims of ineffective assistance of counsel during the plea process.  *See* Lafler v. Cooper, 566 U.S. 156, 162–63, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012); Missouri v. Frye, 566 U.S. 133, 145, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012); Hill v. Lockhart, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985).  Strickland's first prong requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness.'"  Hill, 474 U.S. at 57 (quoting Strickland, 466 U.S. at 688).  The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances."  Strickland, 466 U.S. at 691. The Supreme Court warned about second-guessing professional judgments made by counsel:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court . . . . Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts. That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

McMann v. Richardson, 397 U.S. 759, 769–70, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970).

In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56–57 (quoting McMann, 397 U.S. at 771). Under this standard, representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990). The Eleventh Circuit has commented

that "[t]he right to competent plea bargain advice is at best a privilege that confers no certain benefit," because a defendant "may make a wise decision" without assistance of counsel or a "bad one despite superior advice from his lawyer." Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between [entering a plea] and going to trial." Id. This requires counsel to "offer his informed opinion as to the best course to be followed" and impart "a general knowledge of the possible legal consequences of facing trial" to the defendant. Id. Therefore, a defendant's failure to "correctly assess every relevant factor entering into his decision" does not undermine a validly entered guilty plea. Id. at 1509.

Before discussing the reasonableness of Attorney Hogan's refusal to amend Petitioner's Rule 3.850 motion to include an IATC claim based upon trial counsel's failure to strike Juror Copeland for cause, the court will discuss jury selection principles under federal and Florida law.

A criminal defendant has a right to an impartial jury, and a prospective juror who lacks impartiality must be excused for cause. See Ross v. Oklahoma, 487 U.S.

81, 85–86, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988). To exclude a prospective juror

for cause, a party "must demonstrate that the juror in question exhibited <u>actual</u> <u>bias</u>

by showing either an express admission of bias or facts demonstrating such a close

connection to the present case that bias must be presumed." <u>United States v.</u>

<u>Chandler</u>, 996 F.2d 1073, 1102 (11th Cir. 1993) (emphasis added); *see also* <u>Smith v.</u>

<u>Phillips</u>, 455 U.S. 209, 215, 102 S. Ct. 940, 945, 71 L. Ed. 2d 78 (1982). The burden

is on the challenger to show the prospective juror has actual bias, so as to raise the

presumption of partiality. *See* <u>Irvin v. Dowd</u>, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L.

Ed. 2d 751 (1961). The Supreme Court has upheld a trial court's seating of a juror

even where the juror gave conflicting or ambiguous answers during voir dire about his

ability to be impartial. *See, e.g.*, <u>Patton v. Yount</u>, 467 U.S. 1025, 1038–40, 104 S. Ct.

2885, 81 L. Ed. 2d 847 (1984); <u>Murphy v. Florida</u>, 421 U.S. 794, 801–03, 95 S. Ct.

2031, 44 L. Ed. 2d 589 (1975).

Under Florida law, the test "for determining juror competency is whether the

juror can lay aside any bias or prejudice and render his verdict solely upon the

evidence presented and the instructions on the law given to him by the court." <u>Lusk</u>

<u>v. State</u>, 446 So.2d 1038, 1041 (Fla. 1984). The trial court must grant a party's

motion to strike a prospective juror for cause if there is "any reasonable doubt" as to the juror's impartiality.  Singer v. State, 109 So.2d 7, 23 (Fla. 1959).

The transcript of Petitioner's trial demonstrates that at the beginning of voir dire, the prosecutor announced the names of witnesses and other persons whose names may be mentioned during the course of the trial testimony, and the trial court asked the potential jurors to raise their hands if they recognized a name (Ex. B at 22–23). Several potential jurors raised their hands, including Juror Copeland (id. at 24–31). The court questioned Juror Copeland as follows:

> THE COURT:  Mr. Copeland?
>
> PROSPECTIVE JUROR COPELAND:  Sean Woods.
>
> THE COURT:  How do you recognize that name?
>
> PROSPECTIVE JUROR COPELAND:  Personally.  I grew up around him and his son, when I was a kid.
>
> THE COURT:  Anything about that give you any concern about your ability to judge Sean Wood's testimony?
>
> PROSPECTIVE JUROR COPELAND:  No.
>
> THE COURT:  Feel like you can fairly judge it, look at it objectively like you would any other witness?
>
> PROSPECTIVE JUROR COPELAND:  No.

THE COURT: Let me ask it this way. Do you feel like you have any preconceived notion about Sean Wood's testimony that would make you give him more or less weight than you would any other witness?

PROSPECTIVE JUROR COPELAND: Oh, no.

(Ex. B at 26).

The trial court read the indictment aloud and asked whether any potential juror had heard or read anything about the case, or had some other source of knowledge or information about the case (Ex. B at 32–36). Some of the potential jurors indicated affirmatively, including Juror Copeland, so the court excused the other jurors to take a break while the jurors were more privately questioned (*id.* at 37). The private questioning led to one of those potential jurors being excused because he had discussed the case with Petitioner's father, and stated he did not believe he could be a fair and impartial juror (*id.* at 38–40). Juror Copeland was questioned as follows:

THE COURT: Stareco Copeland. You said you knew something or heard something about the case?

PROSPECTIVE JUROR COPELAND: Yeah. My girlfriend, she lives in Havana, and you know, you get parents around each other, they start gossipping [sic] and talking, so that's how I heard about it.

THE COURT: What do you remember about the gossip or talk that you heard?

PROSPECTIVE JUROR COPELAND:  Just the normal things, like did you hear about so and so, about what happened, the altercation and all that.

THE COURT:  Did you know the names of Ricky Warren or Gabriel Strong [Petitioner's co-defendant] before this moment?

PROSPECTIVE JUROR COPELAND:  Oh, no.

THE COURT:  And there's another witness, Mr. Byrd.  Did you know—when you heard anything about it, did any of this names [sic] ring a bell?

PROSPECTIVE JUROR COPELAND:  No.  I'm not from here.

THE COURT:  Anybody express to you any strong feelings one way or the other about responsibility or anything important about the case?

PROSPECTIVE JUROR COPELAND:  Huh-uh, no.  I just heard of it, and that's all I know.

THE COURT:  So you know that basically what I said occurred, that Mr. Fluker and Mr. Davis were shot.

PROSPECTIVE JUROR COPELAND:  And that's it.

THE COURT:  Okay.  Mr. Allman [the prosecutor], any questions?

MR. ALLMAN:  So Mr. Copeland, whatever you heard was just—I mean, you weren't involved in the conversation, just other people were talking?

PROSPECTIVE JUROR COPELAND:  Yeah.  It was in a room where I was at, and that was it.

MR. ALLMAN:  You weren't participating in the conversation?

PROSPECTIVE JUROR COPELAND:  Huh-uh.

MR. ALLMAN:  And nobody said anything that made you form any fixed opinion, oh, they must be guilty, or oh, they must be not guilty?

PROSPECTIVE JUROR COPELAND:  No.  Just them talking about it, just gossipping [sic] as usual.  That was it.

MR. ALLMAN:  Thank you, Judge.

THE COURT:  Mr. Garcia [counsel for co-defendant Strong]?

MR. GARCIA:  When you say gossip, what do you remember being said?

PROSPECTIVE JUROR COPELAND:  Did you hear about so and so happening, about that Fluker kid, and that was all.  They don't know who did what, and that was it.  And I seen it on the news the day before, and that's when it rung a bell, okay, so, I did see this on the news.

THE COURT:  What do you remember seeing on the news?

PROSPECTIVE JUROR COPELAND:  Just him.  Just me going to the kitchen and looking to the left and seeing it on TV.

THE COURT:  Who did you see?  What do you mean, him.

PROSPECTIVE JUROR COPELAND:  The Fluker kid [the victim who was killed].

THE COURT:  Fluker?

PROSPECTIVE JUROR COPELAND:  Fluker, that was it.

THE COURT:  Was there a photograph of his face or video of the crime scene, or what do you remember?

PROSPECTIVE JUROR COPELAND:  Only thing I remember seeing was the name.

THE COURT:  Fair enough.  Mr. Garcia, I interrupted you.  I apologize.

MR. GARCIA:  I appreciate that, Judge.  Thank you very much. When you say things like so and so—

PROSPECTIVE JUROR COPELAND:  I mean it's just talking, like they were just talking, like, about it.  I didn't really hear that much about the conversation because I wasn't focused on the conversation.  I was talking with somebody else.  But that was it.

MR. GARCIA:  So do I understand correctly you are saying other people were talking, you know they were talking about this, but what they were saying you have no idea?

PROSPECTIVE JUROR COPELAND:  Yeah.  I just know they were talking, and that was it.

THE COURT:  Mr. Cummings, any questions?

MR. CUMMINGS:  No questions.

(Ex. B at 40–43).  Upon questioning another prospective juror regarding her health

concerns, and a different prospective juror about his need to care for his ill wife, the

trial court, with the agreement of the parties, excused those two potential jurors for cause (*id.* 43–46, 51–53).

After the private questioning, general questioning of the panel continued. The trial court asked the prospective jurors to answer eight questions from a questionnaire (Ex. B at 59). Juror Copeland answered the questions as follows:

> Stareco Copeland. Full time student at TCC. No kids. No wife. 17 years in Gadsden county. No, I have never been on a jury before. I have no close friends in law enforcement. I have no close friends charged with a crime. No close friend been a victim of a crime. And yes, I will listen and follow the law instructed by the Court.

(Ex. B at 65).

After general questioning of several more potential jurors, the trial court explained some basic trial principles, such as the presumption of each defendant's innocence, the government's burden of proof, the concept of reasonable doubt, the defendant's right not to present evidence or prove anything, and the jury's fundamental task of determining whether or not the State presented evidence to prove guilt beyond a reasonable doubt (Ex. B at 86–88). The trial court explained to the potential jurors the purpose of voir dire:

> Really what we are trying to find out is bias, prejudice and interest, strong feelings that you have that might affect how you would do your work as a juror. The question is, really, can you follow the law on which

you are instructed?  Can you find the facts from the evidence, putting aside any prior experiences that you might have?

Sometimes jurors are asked things, technical legal things how do you feel about this or how do you feel about that.  If you never thought about something until the moment that you are asked about it, that's okay.  It's okay to say I never thought about that.  I don't have any strong feelings.

What we are trying to get at is, do you have some strong feelings that would influence the way you would do your work as a juror.

(Ex. B at 88–89).

The prosecutor questioned the potential jurors as to whether they could listen to and fairly consider a witness' testimony even though the witness may not be a "model citizen," for example, may have been involved in illegal activity or may have a prior criminal record or a pending charge (Ex. B at 98–103).  The prosecutor asked for a show of hands of anyone who could not fairly consider such evidence (*id.*).  Juror Copeland did not raise his hand (*see id.*).  Prospective juror Clemons did raise her hand, and then admitted that her past experiences with a substance-abusing ex-husband who stalked her and threatened her life so influenced her that she was "always going to think, from what happened to me, . . . this person might be guilty" (*id.* at 99–100).  After additional questioning of the panel, the prosecutor again stated there would be evidence of drug use and drug dealing, and asked for a show of hands

of anyone who did not believe he or she could fairly consider such evidence (*id.* at 103).  Juror Copeland did not raise his hand (*see id.*).   After more questioning and a break, the trial court excused for cause, and with the parties' agreement, prospective juror Clemons (*id.* at 114).

The court and the parties privately questioned another group of potential jurors about personal circumstances they had mentioned in answering the juror questionnaire (Ex. C at 121–58).  The prosecutor then continued his questioning of the panel by asking the group of potential jurors if everyone could agree to set aside their emotions and base their verdict on the law and the evidence (Ex. C at 165).  All of the potential jurors apparently indicated they could (*see id.*).

Counsel for co-defendant Strong asked whether any of the potential jurors knew each other, and several jurors responded affirmatively, including Juror Copeland.  The following exchange is the basis for Petitioner's claim that his trial counsel should have moved to strike Juror Copeland for cause:

> MR. GARCIA [counsel for co-defendant Strong]:  Why don't we start with the front row.  Mr. Copeland, yes?
>
> PROSPECTIVE JUROR COPELAND:  Uh-huh.
>
> MR. GARCIA:  Who do you know?
>
> PROSPECTIVE JUROR COPELAND:  David.

MR. GARCIA:  Okay.  How do you know him?

PROSPECTIVE JUROR COPELAND:  Went to school together.

MR. GARCIA:  Where?

PROSPECTIVE JUROR COPELAND:  Robert F. Monroe.

MR. GARCIA:  This is why this is important to me.  I'll tell you. When you go in the jury room to decide the case, it may be that you disagree about something.  Do you think your relationship with Mr. Iglesias is such that you could disagree with him?

PROSPECTIVE JUROR COPELAND:  I don't know.  It's hard.

MR. GARCIA:  It's hard to disagree with him?

PROSPECTIVE JUROR COPELAND:  It's hard.

MR. GARCIA:  Let's say your boss was in the jury room with you.  You'd be a little bit more reluctant to fight with your boss.  Make sense?

PROSPECTIVE JUROR COPELAND:  Yeah.

MR. GARCIA:  But what kind of relationship did you with [sic] Mr. Iglesias?

PROSPECTIVE JUROR COPELAND:  Friendship.  Whenever we was [sic] in class together, we would talk.

THE COURT:  Let me stop you, Mr. Garcia.  There's nothing improper about the line of questioning, but let me go at it this way.  I usually ask this line of questioning myself, and I forgot.

It's basically a Hatfields and McCoys situation that we are looking for, and let me explain that to you.

I have in the past made the mistake of putting two people on a jury who were in the middle of a divorce. We did not reach a verdict. By the same token, I have found out afterwards that one person was in an employee and employer situation, where instead of having however many were on that jury, we had really one person who got to exercise two votes.

And that's really what we are trying to get at. Rather than asking y'all individually to go through tell [sic] us about your relationship in front of everybody, if you would just let the bailiff know or let me know later on you that have something else you need to talk about in private, we'll talk to you about it in private, if you have that kind of a situation, rather than talking about it in front of everybody else.

Is that acceptable, Mr. Garcia?

MR. GARCIA: Yes, Your Honor, but may I continue that line?

THE COURT: Absolutely. Go ahead.

MR. GARCIA: With the judge's comments, additional comments, let me ask again. Do we have any jurors here that [sic] know each other outside of the courtroom.

(Ex. C at 200–02). In response, prospective juror Harrell indicated that prospective juror James was an administrator at a hospital where Harrell and three other prospective jurors (Shaw, Dickson, and Lewis) worked (*id.* at 202–04).

Following voir dire, the parties exercised peremptory strikes (Ex. C at 212–19).

Petitioner's counsel struck two potential jurors (James (the hospital administrator) and

Perry); the prosecutor struck four (Harrell, Bodison, Dickson, and Shaw); and counsel for co-defendant Strong struck six (Lewis, Papin, Robinson-Keeling, Green, Black, and Faison) (*id.*). No one moved to strike Stareco Copeland or David Iglesias (*see id.* at 219–20).

Prior to the presentation of evidence, the jurors took an oath "to truly try the issues . . . and to render a verdict according to the law and the evidence" (*see* Ex. D at 12; *see also* Fla. R. Crim. P. 3.360 (setting forth the oath of trial jurors)). At the beginning of trial, as well as at the conclusion of the evidence and prior to jury deliberations, the trial court instructed the jury that its verdict must be based solely upon the evidence, or lack of evidence, and the law, not on any emotion (Ex. D at 14, 466–67, 470–72). The written instructions, which were given to the jury, also included these instructions (Ex. A at 44–64).

Petitioner does not allege he informed Attorney Hogan of any evidence, other than the voir dire transcript, to show that Juror Copeland was actually biased against him. But the problem for Petitioner is that the voir dire transcript does not suggest Juror Copeland was actually biased against the defense. To be sure, Juror Copeland expressed uncertainty about whether he could disagree with his friend and former classmate, Juror Iglesias (as noted above, when Copeland was asked whether he could

disagree with Iglesias, Copeland stated, "I don't know. It's hard"). But this was not an unambiguous expression of actual bias or partiality against the defense. With no evidence of actual bias, and thus no legal basis for claiming that Petitioner's trial counsel was ineffective for failing to move to strike Copeland for cause, Attorney Hogan did not perform unreasonably by refusing to amend the Rule 3.850 motion to add the IATC-biased juror claim.

Additionally, Petitioner failed to satisfy <u>Strickland</u>'s second prong. The prejudice prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." <u>Hill</u>, 474 U.S. at 59.

Here, Petitioner alleges he would not have accepted the State's 40-year plea offer if Attorney Hogan had agreed to include the IATC biased-juror claim in the Rule 3.850 motion. In support of this allegation, Petitioner submitted his sworn affidavit, which states the following:

> In February of 2015, after an evidentiary hearing had been granted on Petitioner's motion for postconviction relief, but before the hearing was held, court appointed attorney Kevin Hogan visited Petitioner in Gadsden County Jail. During the visit, Petitioner showed Mr. Hogan the

claim currently contained in the petition under review, attacking trial counsel's failure to remove a biased juror, and asked him to amend his motion to include the claim. However, Mr. Hogan refused to amend the motion. Instead, Mr. Hogan urged Petitioner to accept the plea offered by the prosecutor; forty (40) years in prison in exchange for withdrawing his postconviction motion and cancelling the evidentiary hearing.

Petitioner was certain that his biased juror issue would obtain the new trial he was seeking, but he was not so sure about the claim he was having an evidentiary hearing on. And since he had appointed counsel, he could not amend his motion himself in the state court. Subsequently, he accepted the prosecutor's offer.

Had Mr. Hogan amended Petitioner's motion with the biased juror issue, Petitioner would not have entered the plea offered by the prosecutor; rather, he would have proceeded to the evidentiary hearing and sought a new trial, based on his belief that the state court would have granted a new trial because his verdict was tainted by a biased juror.

(ECF No. 36, Sworn Affidavit of Ricky Warren, Jr.).

Respondent contends Petitioner's allegations are refuted by his sworn statements during a colloquy with the court at a hearing in the state collateral proceeding, and Petitioner's statements in the written plea agreement (ECF No. 42 at 2, 8–13). Respondent additionally contends Petitioner's description of the collateral plea deal as a "gift from GOD" in a subsequently filed state collateral motion, is objective evidence that Petitioner freely and voluntarily entered the collateral plea deal (*id.*).

The record of the post-conviction proceedings includes a written "Plea and Acknowledement [sic] of Rights," signed by Petitioner and Attorney Hogan on February 18, 2015 (Ex. CC). By signing the Plea, Petitioner agreed to plead guilty to the reduced charge of second degree murder as to Count I, that he would be adjudicated guilty of that charge, and that he would be sentenced to a reduced term of 40 years in prison with credit for time served from February 16, 2010, to February 18, 2015 (*id.*). Petitioner agreed that the adjudications of guilt and sentences as to Counts II and III would remain untouched (*id.*). Petitioner expressly waived "his 3.850 and all other appeals and remedies" (*id.*). Petitioner swore that he understood he must answer all of the court's questions truthfully, and if he made a false statement while under oath he could be prosecuted for perjury (*id.*). By signing the Plea, Petitioner stated that no one forced him to enter the plea, that he entered the plea freely and voluntarily, and that he felt the plea was in his best interests (*id.*).

The parties submitted the written Plea to the post-conviction court (*see* Ex. BB). After placing Petitioner under oath, the state post-conviction court conducted the following colloquy:

> THE COURT: Mr. Warren, are you under the influence of any intoxicants today?
>
> THE DEFENDANT: No, sir.

THE COURT:  Have you taken today any alcoholic beverages or street drugs or anything that's interfering with your ability to communicate?

THE DEFENDANT:  No, sir.

THE COURT:  Are you taking any medication that's been prescribed to you?

THE DEFENDANT:  No, sir.

THE COURT:  Mr. Hogan has told me some things today, that you are going to enter a plea of guilty, and that's different than a plea of no contest.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  A plea of guilty says I, Ricky Warren, acknowledge my responsibility for committing criminal acts.  Do you understand that's what a plea of guilty means?

THE DEFENDANT:  Yes, sir.

THE COURT:  It's not saying I, Ricky Warren, am doing this because it's in my best interest, even though I continue to profess my innocence.  A plea of guilty says I, Ricky Warren, am guilty.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  The charge against you, that you will be pleading guilty to, that Mr. Hogan told me you're pleading guilty to, is second degree murder.  Murder in the second degree is punishable by up to life in prison.  Unlike murder in the first degree, it's not mandatory life in prison, but the maximum sentence for second degree murder is life in prison.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Has anyone threatened you, forced you or coerced you in any way to make you plead guilty against your will?

THE DEFENDANT:  No, sir.

THE COURT:  You're giving up rights by pleading guilty.  The reason that we're back together, of course we had a trial in this case, and the reason we're back together is because of the post conviction motion that you filed, a motion under Rule 3.850 of the Florida Rules of Criminal Procedure.

So by entering this plea of guilty, you are giving up—the first thing that you are giving up—you're giving up a lot of things, and we're going to talk about them, but the first thing you are giving up is the right to have a decision by me on the merits on that motion.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  So you are giving up the right to have me consider that motion and decide whether or not there was some problem in the representation that you received or some other problem in the trial at this stage of the proceedings that would allow me to do something like send you back for a new trial or dismiss various of the cases [sic], let you go free or whatever it is, but you are giving up all of your rights to those arguments that you made in your 3.850 motion. Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  The agreement is also that this is it.  It's over with today, and you are affirmatively giving up the right to make any argument in the future to this court or to the First District Court of Appeal or the Florida Supreme Court or the United States Supreme Court that there's anything wrong with the sentence or the plea or the

State's proof or any other thing that you can possibly argue in the future. You are giving it up, and that's the idea behind the plea. The State's consideration for this is going from the first degree murder to the second degree murder. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Are there any questions that you want to ask me about any of the rights that you are giving up?

THE DEFENDANT: No, sir.

THE COURT: And of course you know what the right to a trial is because you had a trial in this case, but one of the things that you might have if you were to prevail on your post conviction motion, or some other motion in the future, is the right to have a new trial. You're giving up all of your rights to a new trial by entering this plea of guilty. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Have you had enough time to discuss with Mr. Hogan the plea, what it means to plea [sic] guilty, the sentence that has been agreed to, the rights that you are giving up? Have you had enough time to discuss everything having to do with your case with Mr. Hogan?

THE DEFENDANT: Yes, sir, I have.

THE COURT: Has he answered all of your questions?

THE DEFENDANT: Yes, sir.

THE COURT: Are there any questions you want to ask me about it?

THE DEFENDANT: No, sir.

THE COURT: Okay. Do you understand the sentence that is to be imposed?

THE DEFENDANT: Yes, sir.

THE COURT: 40 years in the Department of Corrections is a very long sentence. It's not as long as forever, but it is a very long sentence, with all of the credit—basically you will get credit day for day since February 16th, 2010. I will award jail credit, and the Department of Corrections will award you your DOC time.
. . . .
THE COURT: All right. Fair enough. My understanding, Mr. Warren, is that the plea agreement applies to Count 1, the murder count only. Counts 2 and 3 are going to remain the same, the two 30-year prison sentences, but all the time runs at the same time. So assuming nothing else changes in the future, the effective sentence you will be serving is the 40 year sentence that I will impose today. Any questions about that?

THE DEFENDANT: No, sir.

(Ex. BB at 10–16). The post-conviction court accepted Petitioner's plea (*id.* at 18–20), and then specifically with respect to Petitioner's waiver of his right to post-conviction relief, the court verified Petitioner's waiver as follows:

THE COURT: The court accepts and hereby finds that Mr. Warren freely, voluntarily and knowingly waived all existing presently filed and future motions for post-conviction relief based on the trial. He also freely, knowingly and voluntarily waived the right to appeal.

And Mr. Warren, on that let me just say it may be strange to a person to think about it, but even when a person pleas [sic] guilty and

accepts a sentence, as a general matter you have the right to take an appeal within 30 days. But what my understanding is that you have decided that in order to secure this plea agreement from the State, that you're representing to the State that you don't intend to take an appeal, and the state is relying on that representation. In other words, the State wouldn't offer you the plea to second degree murder unless you freely, knowingly and voluntarily waived your right to take an appeal from this sentence that I'm imposing today. Is that your understanding as well?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Now, the other thing, the other term that the state described, and Mr. Hogan said you accepted, was that if something happens, if you should go back on your representation, if you should decide you want to file an appeal, if you should file a 3.850 or any other form of motion that attacks this 40 year sentence in any way, whether it's seeking a new trial or attacking the representation you got from Mr. Hogan, or saying there was something you didn't know or whatever it is, we don't—you don't go back to second degree murder. You go back to the status that you were before I entered this sentence, which was you would be go back [sic] to attacking a first degree murder and a sentence of life in prison. Are you following me?

THE DEFENDANT: Yes, sir.

THE COURT: All right. And is that your agreement?

THE DEFENDANT: Yes, sir.

THE COURT: All right. So that's accepted as well, the waiver of the right to file an appeal or a 3.850 is also accepted.

(Ex. BB at 18–19).

Petitioner's sworn statements in the written Plea document, and his sworn declarations during the post-conviction colloquy, belie his assertion that he would have rejected the 40-year plea offer if Attorney Hogan had agreed to add the IATC biased-juror claim to the Rule 3.850 motion.  Furthermore, Petitioner had every opportunity to tell the post-conviction court that he felt forced to accept the 40-year plea deal because of Attorney Hogan's failure to add the IATC claim, yet Petitioner indicated nothing of that nature and instead assured the court, by virtue of his sworn statement in the written Plea, that he was "fully satisfied" with Hogan's services (*see* Ex. CC at 2).

The record contains additional objective evidence which belies Petitioner's assertion that he truly desired to reject the 40-year plea offer and risk keeping his mandatory life sentence by pursuing a new trial via the IATC-biased juror claim.  In an earlier-filed pro se "supplement" to his Rule 3.850 motion, Petitioner stated under oath that prior to trial, he would have accepted a 30-year plea offer if his trial counsel had informed him that he faced a mandatory life sentence (*see* Ex. AA).

Additionally, on April 13, 2015, just two months after Petitioner entered the plea agreement and received a reduced sentence, he filed a Motion to Reduce or Modify Sentence in the trial court, pursuant to Rule 3.800(c) of the Florida Rules of

Criminal Procedure (ECF No. 18, Ex. EE). Petitioner asked the court to reduce his sentence based upon his accomplishments and pursuits in prison, his remorse for the death of Mr. Fluker, and his commitment to dedicate his life "for good" (*id.*). Petitioner included the following statement in his motion:

> I was sentenced to **NATURAL LIFE WITHOUT THE POSSIBILITY OF PAROLE** with two (2) thirty year concurrent sentences. On February 18th, 2015 I went back to court on an evidentiary hearing. Before the hearing my public defender negotiated a plea for (40) forty years. I accepted this plea. <u>At that point, it was better than life in prison and is a gift from GOD</u>.

(Ex. DD at 2) (underline emphasis added).

Petitioner has failed to demonstrate that Attorney Hogan provided ineffective assistance in the collateral proceeding. Attorney Hogan's refusal to amend the Rule 3.850 motion to add the IATC biased-juror claim was reasonable, and Hogan did not commit serious derelictions of his duty when advising Petitioner to accept the State's 40-year plea offer. Further, Petitioner has failed to convince the court that he would have rejected the 40-year plea offer and risked keeping his life sentence, if Hogan had agreed to add the IATC-biased juror claim in the Rule 3.850 motion, even though the claim had no reasonable probability of success. Petitioner failed to demonstrate that Attorney Hogan was ineffective in the collateral proceeding. Therefore, Petitioner failed to satisfy this component of the <u>Martinez</u> standard.

B.    Has Petitioner demonstrated that his underlying IATC claim is a "substantial" one?

As the Martinez Court stated, to establish cause for a procedural default of an IATC claim, the federal petitioner must not only show that collateral counsel was ineffective, the petitioner must also demonstrate that the underlying IATC claim is a "substantial one," which is to say that the prisoner must demonstrate that the claim has some merit.

In Hittson v. GDCP Warden, the Eleventh Circuit explained Martinez's "substantial claim" requirement:

> Martinez articulated the "substantial claim" requirement as follows:
>
> > To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf.* Miller–El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).
>
> Martinez, — U.S. at —, 132 S. Ct. at 1318–19.  Neither Martinez nor Trevino [v. Thaler, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to Miller–El to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

As the Court explained in <u>Miller–El</u>, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." 537 U.S. at 327, 123 S. Ct. at 1034. Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000). That does not mean that a petitioner must show "that some jurists would grant the petition." <u>Miller–El</u>, 537 U.S. at 338, 123 S. Ct. at 1040. "[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail." *Id.*

We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from <u>Strickland</u>.

759 F.3d 1210, 1269–70 (11th Cir. 2014) (footnotes omitted).

Here, Petitioner has not stated facts that "point to a real possibility" he was

deprived of effective assistance of counsel at trial based upon Attorney Cummings'

failure to move to strike Juror Copeland for cause.  Petitioner asserts Juror Copeland

"was in fact biased against petitioner" (*see* ECF No. 20 at 2), and "[t]he record

supports that a biased juror actually served on petitioner's jury" (*see* ECF No. 2 at 9).

But the only evidence Petitioner identifies to support his assertion is Copeland's

statement that he "didn't know" whether he could disagree with Juror Iglesias.  Juror

Copeland's ambiguous statement that he "didn't know" whether he could disagree

with his friend Juror Iglesias, did not suggest actual bias against the defense or an

inability to fairly assess the evidence and follow the law.  Therefore, Attorney

Cummings' failure to move to strike Copeland for cause was not deficient.  Further,

there is no reasonable probability the result of jury selection or Petitioner's trial would

have been different if Attorney Cummings had moved to strike Juror Copeland for

cause.  Absent evidence that Juror Copeland was actually biased, the court must

presume that the juror followed the judge's instructions and complied with his oath

to render a true verdict according to the law and the evidence.  *See* Hallford v.

Culliver, 459 F.3d 1193, 1204 (11th Cir. 2006); United States v. Khoury, 901 F.2d

948, 955 (11th Cir.), *modified on other grounds*, 910 F.2d 713 (11th Cir. 1990); *see*

*also, e.g.*, Fennell v. Sec'y, Fla. Dep't of Corr., 582 F. App'x 828, 834 (11th Cir.

2014) (unpublished but recognized as persuasive authority) (denying habeas relief on

claim of ineffective assistance of counsel based upon counsel's failure to strike juror for cause; state court reasonably concluded that petitioner failed to show deficient performance and prejudice where there was no evidence that juror was actually biased, and court must presume that juror followed trial judge's instructions, and complied with the oath, to be fair and impartial during deliberations).

Jurists of reason would not find it debatable whether Petitioner stated a valid IATC claim based upon Attorney Cummings' failure to move to strike Juror Copeland for cause. Therefore, Petitioner failed to satisfy the "substantial claim" requirement of <u>Martinez</u>.

## III.    CONCLUSION

Petitioner admittedly failed to exhaust the sole IATC claim presented in his § 2254 petition. Further, Petitioner failed to show he is entitled to a federal merits review of his IATC claim under the "cause and prejudice" exception announced in <u>Martinez</u>. Therefore, his habeas petition should be denied.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is

issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El, 537 U.S. at 336 (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 8<u>th</u> day of November 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

        **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**